McCammon, administrator, *vs.* Worrall and others.

Where the owner of premises subject to the lien of two mortgages given in 1810, and of a judgment docketed in 1815, and of a third mortgage given in 1816, sold the premises to W. with warranty subject to the payment of the three mortgages, the purchaser being ignorant of the existence of the judgment; and where the premises were subsequently sold and conveyed by the sheriff to the plaintiff in the judgment, under an execution issued thereon, and W. subsequently purchased the premises from the plaintiff in the judgment; *Held*, that W. was entitled to hold the premises discharged of the lien of the third mortgage, which was overreached by the sale under the prior judgment.

*Held further*, that if the premises had not been subject to any other incumbrances than the three mortgages mentioned in the original conveyance to W., the premises in the hands of W. would have been the primary fund for the payment of all the mortgages, and the grantor would have been relieved from personal liability for the payment of the debts secured by such mortgages.

An executor or administrator who brings a suit in chancery in good faith for the recovery of a debt which he has reason to suppose is equitably due by the defendant, will not be charged personally with the costs of the latter in defending the suit.

A decree cannot be so far reversed or modified upon an appeal as to deprive a party to the suit below, but who is not made a party to the appeal, of any rights which he acquired by the decree,

This was an appeal, by the defendant Worrall, from a decree of the late assistant vice chancellor of the first circuit. On the 12th of April, 1816, E. Sturtevant was the owner of lots No. 44 and 45, in Elm-street in New-York, and of two other lots in Duane-street, subject to the lien of two mortgages belonging to the estate of J. Bogert deceased, executed in 1810 and 1812, and also subject to the lien of a judgment in favor of the defendant B. De Forrest, for $2259,56, docketed the 18th February, 1815. Sturtevant mortgaged the two lots on Elm-street to John Mc-Cammon, the complainant's intestate, on the 12th of April, 1816, to secure the payment of $2000 in one year, with interest. In July, 1818, Sturtevant and wife conveyed the one half of the two Elm-street lots to the defendant H. Worrall, with general covenants of warranty, subject to the payment of one equal half of the moneys due and to become due upon the mortgages to McCammon and to Bogert's estate; and in August, 1819, Stur-

tevant and wife conveyed the other undivided half of these lots to Worrall, with warranty, subject to the payment of the whole of these mortgages. And as the defendant Worrall alleged in his answer, at the time he received these conveyances respectively, he was ignorant of the existence of the lien of the judgment of De Forrest upon the premises. In December, 1819, De Forrest took out a *fi. fa.* upon his judgment, for the $2259,56, and interest from February, 1815; and the two lots on Elm-street were sold by the sheriff, in January, 1820, under such *fi. fa.*, and they were bid in by the defendant Keeler, as the agent for De Forrest, for $1000. De Forrest shortly afterwards sold the two lots to Worrall for $2000, subject to the lien of the mortgages due to the estate of Bogert, which were prior to the docketing of the judgment.

The bill in this cause was filed, between nine and ten years afterwards, to foreclose the mortgage given to McCammon ; upon which no interest had been paid subsequent to 1819. And Worrall, De Forrest, Keeler, R. McQueen, and the executor of Bogert were made defendants therein. The bill charged that the premises in question were released by De Forrest from the lien of his judgment, and that the judgment was subsequently assigned to Worrall, or to some one for his use ; and that Worrall procured the execution to be issued, and the property to be bid in by Keeler for his benefit, and that Keeler afterwards conveyed the same to him. These allegations, however, were fully denied by the several answers of Worrall, and De Forrest and Keeler ; by which answers it appeared that De Forrest, after Sturtevant had attempted to obtain a release of the premises from the judgment for much less than the amount due, by a false representation that McCammon's mortgage was older than the judgment and that the incumbrances which were prior to the judgment were to the full value of the premises, caused the execution to be issued and the premises to be bid in for him, by Keeler, for the sum of $1000 ; and that he subsequently sold the premises to Worrall for $2000, as above stated. And these answers were fully supported by the testimony of E. W. King, who was the attorney of De Forrest in the judgment.

*D. Lord*, for the appellant.

*H. Nicoll*, for the respondents.

THE CHANCELLOR.　If the answer of Worrall is to be credited, and I see no ground whatever for impeaching it, he has not only the legal title to the premises, discharged of the lien of the complainant's mortgage, but has also the equitable right to hold them as against the complainant's claim.

The assistant vice chancellor is right in supposing that under the two deeds from Sturtevant to Worrall, if there had been no other incumbrances than the mortgages mentioned in those deeds, the premises would have been the primary fund to pay off and discharge the McCammon mortgage, so as to relieve Sturtevant from personal liability.　But when Worrall was afterwards compelled to pay the $2000 to De Forrest, to obtain the legal title to the premises which the latter had acquired under the sheriff's sale upon the execution issued on the judgment, neither Sturtevant nor McCammon had any right, either at law or in equity, to insist that the premises, in the hands of Worrall under his subsequently acquired title, should still be subjected to the payment of the $2000 mortgage of McCammon, the lien of which was overreached and discharged by the title received from De Forrest.

The assistant vice chancellor, however, has based his decree upon the supposition that, as there is no evidence that Worrall ever paid the $1584, which, as appears by the testimony of Bogardus and the articles of dissolution, was to be paid to Sturtevant at the time of the dissolution of the copartnership, the property in his hands ought to be subjected to the payment of this larger sum of $2000, which was due from Sturtevant to McCammon.　The short answer to that is, that no such claim is made in the complainant's bill, and no such fact was in issue in the case.　The defendant Worrall therefore has had no opportunity to prove that he fully paid to Sturtevant all that was due to him upon the copartnership account.　And after the lapse of ten years, the legal presumption was that it had been

paid; unless there was some proof to the contrary. Again, Sturtevant, or his personal representative if he was dead, was a necessary party to a bill to adjust the accounts between Worrall and Sturtevant arising under the agreement for the dissolution of the copartnership.

I have not been able to find any thing in the pleadings or testimony to show that lots No. 22 and 24, in Elm-street, where, by the articles of copartnership, the business was to be carried on, were the same as lots No. 44 and 45 in that street which are the premises in question in this suit; yet the vice chancellor assumes that to be the fact, and perhaps he may be right. But there is nothing in the deed of the 7th of July, 1818, which was given more than four months after the commencement of the copartnership, or in the subsequent deed of August, 1819, to show that the premises in question were ever considered or treated, by either of the parties, as partnership property; although if the lots No. 22 and 24 Elm-street mentioned in the copartnership agreement of March, 1818, as the place where the business was to be carried on, were in fact the premises in question, it would have been perfectly proper that each partner should own one half of the property, to prevent any question as to the payment of rent from the one to the other.

I think the assistant vice chancellor, however, has done Worrall great injustice, in supposing that his answer is so entirely contradicted by testimony, not only in the main fact of his knowledge of the judgment at the time he took the deed, but in other particulars, as to be wholly unworthy of credit; and also in supposing that he was a party to the fraud which was attempted to be practised by Sturtevant upon De Forrest. The conclusion at which my mind has arrived upon the whole case is, that the answer of the defendant Worrall is true; and that General Bogardus, the witness, after the lapse of more than sixteen years, made a mistake as to the time when the release of the judgment was brought to him. Such release, I think, was in fact brought to him after the deed had been executed and recorded; and probably after the payment of the interest on the McCammon mortgage in October, 1819. It appears that Bogardus was the

McCammon v. Worrall.

attorney of Worrall in all his transactions about that time; and he must have been frequently called upon by Worrall in relation to his business matters. It would not, therefore, be surprising that the General, after such a lapse of time as occurred before he was called on to testify, should have mistaken the precise time and order in which events occurred, and their necessary connection with each other. The question whether the judgment was older or younger than the mortgage to McCammon, was not material to the execution of the deed. For Worrall, if he knew of the existence of the judgment, would want it discharged before he took the conveyance, whether it was older or younger than the mortgage, which was to remain a lien upon the mortgage money in his hands. It is wholly improbable, therefore, that the deed was executed at the time the release was taken to Bogardus, as the counsel of Worrall, to see whether it was such an one as would discharge the premises from the judgment; or that he accepted the deed after he carried back the release to King, and was told by him that he had discovered that the judgment was older than the mortgage, and that the agreement to release would not be carried into effect.

My conclusion, from the pleadings and proofs, is that some other cause delayed the execution of the papers, after they were drawn, until the 30th of August, 1839, when the deed, dated the 25th of that month, was executed and acknowledged, not in the presence of General Bogardus, but before N. B. Graham, and was witnessed by the latter and by his son N. B. Graham jun.; and that both deeds were put on record by Worrall himself, on the 3d of September, 1819. For it appears by the register's memorandum, on one of the deeds, that it was recorded *for and at the request of* Henry Worrall. The articles of dissolution, which provided for the payment of the $1584, may have remained in the hands of General Bogardus until the time when the release was brought to him for inspection; as there might be a good reason for retaining that until Worrall had inquired and satisfied himself as to whether he had to pay off any incumbrances on the premises. Worrall, in his answer, swears that he discovered *for the first time* that De Forrest had a judgment which constituted a lien upon the premises, *some short time*

*after* he had received the two deeds; that is, I presume, the last of the two deeds. And that he communicated the fact to Sturtevant, who assured him the judgment was subsequent to McCammon's mortgage, and that he could procure a release for far less than the amount of the judgment. The answer also states that, according to the belief of the defendant Worrall, the time when the release was handed to him to be shown to his counsel, was some time in November, 1819. As to the time when this release was thus delivered to him, his answer is corroborated by that of De Forrest; who swears that the time when Sturtevant called upon him to get him to give the release was about the *first day of November*, 1819; and that shortly after, in pursuance of the agreement made with Sturtevant, he executed the release, and delivered it to Worrall to be shown to his counsel. It is true, Mr. King, in his testimony, speaks of the time when Sturtevant *first* spoke *to him* about releasing the judgment, as *in* or *about* the month of August. But when he first saw his client and communicated the proposition to him, or whether Sturtevant had not seen the client personally, previous to the time when the release was drawn, as De Forrest in his answer swears he had, Mr. King does not state, in his testimony. And as he was the solicitor and had drawn both the answers of De Forrest and of Worrall, it is hardly probable that he meant to be understood that his recollection differed from theirs as to the time when the release was given to Worrall, to be shown to General Bogardus as his counsel.

Again; the consent to the issuing of the execution was not signed until the 12th of November; and King swears that he obtained it the first time he saw Sturtevant after he discovered that the judgment was older than the mortgage, and the release was returned. And it is hardly probable that if this intended fraud of Sturtevant was discovered as early as the 30th of August, when the deed was acknowledged before Mr. Graham, or on the 3d of September, when it was actually recorded, that King or De Forrest would have waited two or three months before they attempted to enforce the collection of the judgment. The reasonable presumption from these facts, therefore, is that

the release was shown to Bogardus at the time stated in the answers of Worrall and of De Forrest, and not before the delivery of the deed as the General supposed. And that after the release was returned, and Worrall was informed by King that De Forrest had been imposed upon, by the false representation of Sturtevant that the mortgage of McCammon was older than the judgment, Worrall communicated that fact to Bogardus his counsel; perhaps as a reason why the agreement for a dissolution should not be delivered to Sturtevant until some other arrangement was made between them; if that agreement was still in the hands of Bogardus. Whether it remained in the hands of Bogardus until the taking of testimony in this cause, and was produced by him, on the part of the complainant, or went into the hands of Worrall and was produced as an exhibit on his part, I am unable to ascertain from the papers before me; as there is no mark on this exhibit showing which party produced it on the examination of witnesses. But I infer from the testimony of Bogardus, and his reference to this exhibit, that it was a paper remaining in his hands.

I have been unable to discover upon what grounds the assistant vice chancellor arrived at the conclusion that Worrall was a party to the fraud attempted to be practised upon De Forrest, in direct contradiction to his sworn answer, that Sturtevant represented to him, when he ascertained the existence of such a judgment, that it was junior to McCammon's mortgage and that he could get it released for a small sum. I have before shown that Gen. Bogardus must have been under a mistake in supposing that the question as to the existence of this judgment, and whether it was junior or senior to the mortgage, arose before the execution of the deeds. Independent of this, there is not a particle of testimony to show that Worrall was attempting to practise a fraud upon De Forrest by a false representation as to the priority of the mortgage. And the fact that he refused to receive the release when it was tendered to him, and to pay the $800, which would have been due from him under the agreement if a release could be obtained, without consulting his counsel in the first place, is a strong circumstance in his favor. For if he had sus-

pected that the judgment was older than the mortgage he would have been anxious to obtain the release immediately, before De Forrest or his attorney should have ascertained the fact. The conclusion at which I have arrived on this question, therefore, is that Worrall as well as De Forrest were imposed upon by Sturtevant, in this matter; if the latter had not himself made a mistake as to the time when the judgment was actually entered.

How the matters were arranged between Worrall and Sturtevant, after it was ascertained that the judgment could not be released, does not appear, except from the answer of Worrall. And as the bill does not attempt to set up any equitable claim arising out of any subsequent transactions between them, it is of no consequence whatever in this suit how they arranged the matter; as it could not affect the decision of this cause upon these pleadings.

The decree of the assistant vice chancellor in directing the lands of the appellant Worrall to be sold to pay the mortgage of the complainant, which mortgage was no longer either a legal or an equitable incumbrance upon the premises in question, after the sale by the sheriff, is therefore erroneous. It must be reversed, so far as respects the rights of the appellant and the respondent McCammon, as between themselves. But as I suggested on the argument, I cannot reverse or alter the decree so as to deprive other parties who have had no notice of the hearing upon this appeal, of any rights to costs, or otherwise, which they may have acquired by the terms of that decree. And as a part of the decree appealed from provides for the payment of the costs of Bogert and McQueen out of the proceeds of the appellant's property, he must provide for the payment of those costs, or they must remain a charge upon the premises in question. So much of the residue of the decree as is appealed from must be reversed.

The circumstances of this case are such that an executor or administrator, suing in good faith to obtain a debt which he had reason to suppose was an equitable lien upon the premises in controversy ought not to be charged with costs personally; and I am also inclined to think that the costs ought not to be charged upon the estate of the decedent in his hands. I shall not therefore give costs to the appellant, as against the respondent, either in the court below or in this court.